--------------------------------------------------- x

In re:           :

Telogy, LLC, et al.,       :

Debtors.[1]         :

--------------------------------------------------- x

Chapter 11

Case No. 10-10206 (____)

Joint Administration Pending

Objection Deadline for Bid Procedures: _____, 2010 at 4:00 p.m.
Hearing Date for Bid Procedures: _____, 2010 at __:00 _.m.
Objection Deadline for Sale Motion: _____, 2010 at __:00 _.m.
Hearing Date for Sale Motion: _____, 2010 at __:00 _.m.

## MOTION OF TELOGY, LLC FOR ORDERS: (A)(I) APPROVING BID PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF ITS ASSETS; (II) SCHEDULING HEARING TO CONSIDER SALE OF ASSETS; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV) APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (B)(I) AUTHORIZING AND APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF

Telogy, LLC ("**Telogy**"), one of the debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**" or the "**Company**"), through its undersigned proposed co-counsel, submits this motion (the "**Motion**"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of orders approving, among other things, the sale of Telogy's assets, related bidding procedures, and certain protections for a potential purchaser of such assets ("**Motion**"). In support of this Motion, Telogy respectfully represents:

---

[1]    The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) e-Cycle, LLC (1582) and (ii) Telogy, LLC (1530). The Debtors' executive headquarters are located at 3200 Whipple Road, Union City, California 94587.

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND

2.     On January 24, 2010 (the "**Petition Date**"), Telogy and e-Cycle, LLC ("**e-Cycle**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors have requested that these chapter 11 cases be consolidated for procedural purposes.  As of the date hereof, no official committee of unsecured creditors has been appointed.

3.     The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Affidavit of Gary B. Phillips, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings, which was filed on the Petition Date.

## TELOGY'S DECISION TO SELL THE PURCHASED ASSETS

4.     Prior to the commencement of these chapter 11 cases, Telogy faced significant challenges and operational difficulties which resulted in severe liquidity constraints.  In December 2008, Telogy retained Broadpoint Capital, Inc. ("**Broadpoint**"), as investment banker, to assist Telogy in its analysis, consideration and pursuit of potential divestitures of its

assets. During these endeavors, in September 2009, the Company sold its international operations, which were run by Telogy International, N.V., a non-Debtor wholly owned subsidiary of Telogy.

5.      Unfortunately, given Telogy's need to reduce its debt load and interest expense, and Telogy's increasing concerns about the potential deterioration of its business and concomitant degradation in value, Telogy ultimately determined that the value of its estate would best be maximized and preserved through the sale of its remaining operations. After a lengthy marketing process, Telogy determined that the bid from McGrath Rent Corp. ("**McGrath**" or the "**Potential Purchaser**") was a viable opportunity and commenced these chapter 11 cases to implement the proposed transaction with McGrath pursuant to section 363 of the Bankruptcy Code, subject to a competitive sale process and the solicitation of higher and/or otherwise better offers (a "**Sale**"). Telogy believes that, unless a Sale is expeditiously consummated, whether to the Potential Purchaser or to a purchaser submitting a higher or otherwise better offer, there will be significant deterioration in the value of its estate. Telogy also believes that its business is not of a type that can endure a prolonged stay in chapter 11 without significant risk to Telogy's survival. Accordingly, the prompt pursuit and consummation of a Sale is essential to maximization of the value of Telogy's assets.

6.      In furtherance of this objective, Telogy negotiated extensively with McGrath on the terms and conditions of the Asset Purchase Agreement (the "**Stalking Horse Purchase Agreement**"),[2] which was executed prior to the Petition Date. The Stalking Horse Purchase Agreement contemplates the sale of substantially all of Telogy's assets (as more

---

[2]    A copy of the Stalking Horse Purchase Agreement, in substantially final form but excluding schedules and exhibits, is annexed hereto as Exhibit A.

DB02:9183934.1                                 069120.1001

specifically identified in the Stalking Horse Purchase Agreement, the "**Purchased Assets**") to the Potential Purchaser, free and clear of all liens, claims, encumbrances and other interests (as more particularly defined in the Sale Order, collectively, "**Interests**") other than those expressly assumed by the Potential Purchaser. Any such non-assumed Interests against or in the Purchased Assets will attach to the net proceeds of a Sale, in the order of priority and with the same validity, force and effect that such Interests may now have against such assets.

  7.  To obtain the maximum value for the Purchased Assets, Telogy proposes to subject the sale of the Purchased Assets to an auction process with the Stalking Horse Purchase Agreement serving as a basis for any competing bids. In connection with the auction process, as a condition to serving as the "stalking horse," the Potential Purchaser insisted on certain bidding protections, including, under certain circumstances, a break-up fee in the amount of $500,430 (the "**Break-Up Fee**"), and expense reimbursement not to exceed $166,810 (the "**Expense Reimbursement**"). Subject to this Court's approval, Telogy's obligations to pay the Break-Up Fee and Expense Reimbursement would constitute superpriority administrative expenses under Section 503(b)(1) of the Bankruptcy Code. In addition, such obligations would (if approved by the Court) be, under certain circumstances, secured by a lien on certain of Telogy's assets.[3] If no other qualified bids are received for the Purchased Assets that are higher or otherwise better than the transaction set forth in the Stalking Horse Purchase Agreement,

---

[3]   Prior to the Petition Date, Telogy agreed, in connection with the Stalking Horse Purchase Agreement, to grant the Potential Purchaser a lien on all of Telogy's personal property, to secure Telogy's obligations, if any, to pay the Break-Up Fee and Expense Reimbursement, if such obligations are triggered under certain specified provisions of the Stalking Horse Purchase Agreement. In connection with that grant, the administrative agent under the Debtors' prepetition secured revolving credit facility and term loan facility agreed, under certain circumstances, to subordinate its lien on the subject collateral to that of the Potential Purchaser.

DB02:9183934.1

069120.1001

Telogy intends to sell the Purchased Assets to the Potential Purchaser pursuant to the terms of the Stalking Horse Purchase Agreement.

8.     The Sale of the Purchased Assets is subject to this Court's approval and the auction process proposed herein. Telogy believes that the Sale of the Purchased Assets will maximize the value of its estate for the benefit of its creditors and other interested parties.

## SUMMARY OF RELIEF REQUESTED[4]

9.     Telogy seeks, pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014, the Court's approval of: (a) assumption of the Stalking Horse Purchase Agreement, and the Sale of the Purchased Assets pursuant thereto, free and clear of Interests, or the right to consummate a higher or otherwise better offer or transaction (a "**Superior Transaction**") with an alternative buyer (an "**Alternative Buyer**"); (b) the institution of certain bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Purchased Assets, including the Break-Up Fee and Expense Reimbursement payable to the Potential Purchaser (collectively, the "**Bidding Procedures**," attached hereto as Schedule 1 to the Bidding Procedures Order (as defined below)); and (c) the assumption, assignment and/or transfer of certain executory contracts and unexpired leases to the Potential Purchaser or, alternatively, to such other Successful Bidder (as defined in the Bidding Procedures). Under the terms of the Stalking Horse Purchase Agreement, the Sale to Potential Purchaser must close no later than 90 days after the Petition Date.

10.     More specifically, through this Motion, Telogy requests that the Court enter the following orders:

---

[4]     Capitalized terms in this summary have the meanings given to them in this Motion.

069120.1001

(a)  The Bidding Procedures Order:  An order (the "**Bidding Procedures Order**," in substantially the form attached hereto as Exhibit B) approving: (i) the Bidding Procedures; (ii) the Expense Reimbursement provision of the Stalking Horse Purchase Agreement; (iii) the Break-Up Fee provisions of the Stalking Horse Purchase Agreement; (iv) the notice (the "**Notice of Auction and Sale Hearing**") setting forth the dates, times, and locations of the deadline to bid on the Purchased Assets, the auction of the Purchased Assets (the "**Auction**") and the sale hearing for the Purchased Assets (the "**Sale Hearing**"), pursuant to the schedule proposed in the Bidding Procedures Order, subject to the Court's availability; and (v) the notice (the "**Notice of Assumption and Assignment**") of Telogy's intent to assume, assign and/or transfer to the Potential Purchaser or, alternatively, to such other Successful Bidder, certain contracts, commitments, leases, licenses, permits, purchase orders, and any other executory contracts and unexpired leases (collectively, the "**Executory Contracts and Unexpired Leases**"), and the corresponding cure amounts required to be paid in connection with such assumption, assignment and/or transfer.

(b)  The Sale Order:  Following the Auction (if any), an order (the "**Sale Order**," in substantially the form attached hereto as Exhibit C) for the approval of (i) the sale of the Purchased Assets free and clear of Interests, and (ii) the assumption, assignment, and/or transfer of the Executory Contracts and Unexpired Leases to the Potential Purchaser or, alternatively, to such other Successful Bidder under the Bidding Procedures.

11.  Telogy expressly reserves the right to modify the relief requested in this Motion, including the proposed Bidding Procedures, prior to or at the applicable hearing.

## THE STALKING HORSE PURCHASE AGREEMENT

12.  Following extensive discussions and negotiations, Telogy and the Potential Purchaser agreed to the terms of the Stalking Horse Purchase Agreement for the purchase of the Purchased Assets.  The significant terms of the Stalking Horse Purchase Agreement are:[5]

---

[5]  Local Rule 6004-1 states that the Sale Motion "must highlight material terms, including but not limited to (a) whether the proposed form of sale order and/or the underlying purchase agreement constitutes a sale or contains certain highlighted provisions, (b) the location of any such provision in the proposed form of order or purchase agreement, and (c) the justification for the inclusion of any such provision."  Local Rule 6004-1(b)(iv).  In addition, "[a] debtor may file a Sale Procedures Motion seeking approval of an order . . . approving bidding and auction procedures either as part of the Sale Motion or by a separate motion filed in anticipation of an auction and a proposed sale."  Local Rule 6004-1(c).  Pursuant to Local Rule 6004-1(c)(i), the Sale Procedures Motion must highlight certain provisions contained in the Sale Procedures

069120.1001

(a)  Purchased Assets:  Pursuant to <u>Section 2.1</u>, Purchased Assets include all right, title and interest of Telogy in, to or under all of the properties and assets of Telogy of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business, but in all cases excluding the Excluded Assets (described below).

(b)  Excluded Assets:  Pursuant to <u>Section 2.2</u>, notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement, Telogy will in no event be deemed to sell, transfer, assign or convey, and Telogy shall retain all right, title and interest to, in and under the following Excluded Assets:

  (i)  all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, except for cash and cash equivalents representing Customer Security Deposits, <u>see</u> <u>Section 2.2(a)</u>;

  (ii)  all rights of Telogy or Telogy International under that certain Asset Purchase Agreement, dated as of September 21, 2009 (the "<u>Telogy International Asset Purchase Agreement</u>"), by and between Telogy, Telogy International and Microlease plc and all other agreements, certificates, instruments, documents and writings delivered by the parties to the Telogy International Asset Purchase Agreement in connection therewith (together with the Telogy International Asset Purchase Agreement, collectively, the "<u>Telogy International Transaction Documents</u>"), including any rights to proceeds, or future payments or proceeds, due to Telogy or Telogy International pursuant to, arising out of or relating to the sale of assets pursuant to the Telogy International Transaction Documents, <u>see</u> <u>Section 2.2(b)</u>;

  (iii)  all deposits (including security deposits for rent and electricity) and prepaid charges and expenses of Telogy, other than the Purchased Deposits and all Customer Security Deposits, <u>see</u> <u>Section 2.2(c)</u>;

  (iv)  all minute books, stock ledgers, corporate seals and stock certificates of Telogy, <u>see</u> <u>Section 2.2(d)</u>;

  (v)  all Avoidance Actions (including the proceeds thereof), <u>see</u> <u>Section 2.2(e)</u>;

---

Order.  Since Telogy seeks to have the Bidding Procedures approved as part of the Sale Motion, the Debtors have highlighted the relevant provisions of both the Stalking Horse Purchase Agreement and the Bidding Procedures below, in accordance with Local Rule 6004-1.  In recognition of the non-exclusive nature of the lists provided in Rule 6004-1(b)(iv) and (c)(i), and although not explicitly referenced therein, Telogy also highlights additional material terms of the Stalking Horse Purchase Agreement and the Bidding Procedures for the Court's convenience.  The following is a summary of certain of the material terms set forth in the Stalking Horse Purchase Agreement annexed hereto as <u>Exhibit A</u>.  Capitalized terms used but not defined in this section have the meanings given to them in the Stalking Horse Purchase Agreement.  To the extent that this summary differs in any way from the terms set forth in the Stalking Horse Purchase Agreement, the terms of the Stalking Horse Purchase Agreement shall control.

069120.1001

(vi)     any Contracts that are not Assumed Agreements, not listed or described in Schedule 2.1(a)(iv) attached to the Stalking Horse Purchase Agreement (after giving effect to the terms set forth in the next to last paragraph of Section 2.1), as the same may be supplemented pursuant to Section 2.5 of the Stalking Horse Purchase Agreement, see Section 2.2(f);

(vii)    any rights, claims or causes of action of Telogy arising under the Stalking Horse Purchase Agreement or the Ancillary Documents, including all right, title and interest to the Cash Consideration, see Section 2.2(g);

(viii)   all receivables, claims or causes of action related primarily to any Excluded Asset, see Section 2.2(h);

(ix)     all rights under insurance policies relating to claims for losses related primarily to any Excluded Asset or Excluded Liability, see Section 2.2(i);

(x)      any letters of credit, deposits, claims or prepaid charges and expenses paid primarily in connection with or primarily relating to any Excluded Assets or Excluded Liabilities, see Section 2.2(j);

(xi)     all Documents primarily relating to an Excluded Asset or an Excluded Liability, see Section 2.2(k);

(xii)    any assets of Benefit Plans, see Section 2.2(l);

(xiii)   all claims or causes o f action of Telogy against any current or former directors or officers of Telogy and all of the rights of Telogy and third parties under Telogy's insurance policies providing coverage for current and former directors or officers of Telogy and to the proceeds thereof with respect to such claims or causes of action, excluding any rights, claims, causes of action, choses in action, rights in action, rights to damages and other similar claims that are identified as Purchased Assets in Section 2.1(a)(xi) of the Stalking Horse Purchase Agreement, see Section 2.2(m);

(xiv)    all claims or causes of action of Telogy against any current or former Affiliate, employee, agent, attorney, consultant, financial advisor, legal representative, shareholder, partner or successor or assign of any of the foregoing Persons, excluding any rights, claims, causes of action, choses in action, rights in action, rights to any damages and other similar claims that are identified as Purchased Assets in Section 2.1 of the Stalking Horse Purchase Agreement, see Section 2.2(n);

(xv)     all commercial torts and other rights, claims, causes of action, choses in action, rights in action, rights to tender claims or demands to Telogy's insurance companies, rights to any insurance proceeds, rights under any policy of insurance or tail under which Telogy is the insured, rights to any damages and other similar claims (including any rights, claims or causes of action arising out of events occurring prior to the Petition Date, relating

DB02:9183934.1     069120.1001

or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Telogy), excluding any rights, claims and causes of action that are identified as Purchased Assets in <u>Section 2.1(a)(xi)</u> of the Stalking Horse Purchase Agreement, <u>see</u> <u>Section 2.2(o)</u>;

(xvi)  Tax refunds, <u>see</u> <u>Section 2.2(p)</u>;

(xvii)  the capital stock and all assets of Telogy International and e-Cycle, <u>see</u> <u>Section 2.2(q)</u>;

(xviii)  all inter-company debt and/or either monies owed to or owing to Telogy by Telogy International or e-Cycle, <u>see</u> <u>Section 2.2(r)</u>; and

(xix)  all Real Property Leases, including the Real Property Lease for Telogy's premises located in Union City, California, <u>see</u> <u>Section 2.2(s)</u>.

(c)  <u>Consideration</u>:  Pursuant to <u>Section 3.1</u> of the Stalking Horse Purchase Agreement, the aggregate consideration is (i) an amount equal to Sixteen Million Six Hundred and Eighty-One Thousand Dollars ($16,681,000), which amount is subject to adjustment pursuant to <u>Section 3.4</u> of the Stalking Horse Purchase Agreement and which shall be applied to the reduction of Telogy's outstanding Liabilities under the Existing Credit Facilities (the "**Cash Consideration**"), and (ii) the assumption by Potential Purchaser of the Assumed Liabilities (described below) (collectively, the "**Purchase Price**").

(d)  <u>Closing Date Payment</u>:  Pursuant to Section 3.2 of the Stalking Horse Purchase Agreement, at the Closing, Potential Purchaser shall (i) pay to the Agent under the Existing Credit Facilities the Closing Date Payment, and (ii) deposit cash in an amount equal to the Initial Escrow Amount (<u>i.e.</u>, $3,336,200) in the Escrow Account pursuant to the Escrow Agreement.

(e)  <u>Assumed Liabilities</u>:  Pursuant to <u>Section 2.3</u> of the Stalking Horse Purchase Agreement, upon the terms and subject to the conditions set forth in the Stalking Horse Purchase Agreement, on the Closing Date the Potential Purchaser shall execute and deliver to Telogy the Assignment and Assumption Agreement pursuant to which the Potential Purchaser shall assume and agree to thereafter discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), only the Liabilities of Telogy arising after the Closing Date under the Assumed Agreements (including any warranties, reserves for sales credits and adjustments or liabilities relating to Purchased Deposits) or reserves for sales credits and adjustments associated therewith) to the extent such Assumed Agreements have been validly assigned to Potential Purchaser pursuant to the Sale Order (collectively the "**Assumed Liabilities**") and no other Liabilities.  Notwithstanding the foregoing, for purposes of clarification, the Assumed Liabilities shall not include (a) any Liability that arises as a result of any obligation of Telogy to act or refrain from acting under the Assumed Agreements

9

or any breach by Telogy of any applicable contractual obligation prior to the Closing, and (B) any Liability arising after the Closing Date but that accrued, or is solely attributable to benefits received, prior to the Closing.

(f) Excluded Liabilities: Pursuant to Section 2.4 of the Stalking Horse Purchase Agreement, notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement, neither Potential Purchaser nor any Affiliate of Potential Purchaser shall assume and neither Potential Purchaser nor any Affiliate of Potential Purchaser shall be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Telogy, and Telogy shall be solely and exclusively liable with respect to all Liabilities of Telogy, other than the Assumed Liabilities (collectively the "**Excluded Liabilities**").

(g) Employees and Employee Benefit Plans:

(i) Pursuant to Section 8.2 of the Stalking Horse Purchase Agreement, prior to the Closing, Potential Purchaser (directly or indirectly through one or more of its Affiliates or agents) shall have the right (but not the obligation), in its sole discretion, to negotiate employment or other arrangements with such employees or independent contractors of Telogy as determined by Potential Purchaser. Potential Purchaser (directly or indirectly through one or more of its Affiliates or agents) shall have the right (but not the obligation) to offer employment to any of the employees or independent contractors of Telogy as Potential Purchaser may determine in its sole discretion.

(ii) Effective as of the Closing, the Transferred Persons shall cease to be covered by the Benefit Plans. Telogy shall retain responsibility for and continue to pay all medical, life insurance, disability, and other welfare plan expenses and benefits for each Transferred Person with respect to claims incurred by such Transferred Person or his covered dependents prior to the Closing. Expenses and benefits with respect to claims incurred by Transferred Persons or their covered dependents on or after the Closing shall be the responsibility of Potential Purchaser.

(h) Termination: Pursuant to Section 10.1 of the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement may be terminated at any time prior to the Closing Date by:

(i) the mutual written consent of Potential Purchaser and Telogy, see Section 10.1(a);

(ii) by Potential Purchaser if (A) Telogy has not made the Filings commencing the Bankruptcy Case within three (3) Business Days of the Effective Date; (B) Telogy withdraws the Sale Motion; (C) Telogy files with the Bankruptcy Court any plan or reorganization or liquidation (or file any document or make any public statement supporting any such plan

069120.1001

filed by any other party) that does not contemplate the transactions contemplated by this Agreement or a transaction in accordance with the Bidding Procedures Order; (D) the Bankruptcy Court enters an Order dismissing, or converting any of the cases comprising part of the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code; (E) a trustee or examiner is appointed in the Bankruptcy Case; or (F) Telogy files a motion seeking entry of an Order of the Bankruptcy Court to convert any of the cases comprising part of the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code or seeking the appointment of a trustee or examiner in the Bankruptcy Case, see Section 10.1(b);

(iii)   by Potential Purchaser if the Closing Date has not occurred within ninety (90) days of the Effective Date, time being of the essence; provided, however, that Potential Purchaser shall only be permitted to terminate the Stalking Horse Purchase Agreement pursuant to Section 10.1(c) if it is not then itself in material breach of any of its representations, warranties, covenants or agreements contained herein, see Section 10.1(c);

(iv)   by Potential Purchaser if, following the Effective Date, a Material Adverse Effect occurs, see Section 10.1(d);

(v)   by Potential Purchaser in the event of any breach by Telogy of any of Telogy's agreements, covenants, representations or warranties contained in the Stalking Horse Purchase Agreement, provided (A) such breach would result in the failure of a condition set forth in Section 9.2(a) or 9.2(b) of the Stalking Horse Purchase Agreement to be satisfied and (B) such breaches are not cured or are not capable of being cured within ten (10) days of receipt of a Termination Notice (as defined in the Stalking Horse Purchase Agreement); provided, however, that Potential Purchaser shall only be permitted to terminate the Stalking Horse Purchase Agreement pursuant to Section 10.1(e) of the Stalking Horse Purchase Agreement if (1) Potential Purchaser is not itself then in material breach of any of its representations, warranties, covenants or agreements contained herein, (2) Potential Purchaser sends a written notice of termination (a "**Termination Notice**") to Telogy, and (3) Potential Purchaser specifies in such Termination Notice the representation, warranty, covenant or agreement contained herein of which Telogy is allegedly in breach, see Section 10.1(e);

(vi)   by Telogy in the event of any breach by Potential Purchaser of any of Potential Purchaser's agreements, covenants, representations or warranties contained in the Stalking Horse Purchase Agreement, provided (i) such breach would result in the failure of a condition set forth in Section 9.3(a) or 9.3(b) of the Stalking Horse Purchase Agreement to be satisfied and (ii) such breaches are not cured or are not capable of being cured within ten (10) days of receipt of a Termination Notice; provided, however, that

DB02:9183934.1                                                      069120.1001

Telogy shall only be permitted to terminate this Agreement pursuant to Section 10.1(f) of the Stalking Horse Purchase Agreement if (A) Telogy is not itself then in material breach of any of its representations, warranties, covenants or agreements contained herein, (B) Telogy sends a Termination Notice to Potential Purchaser and (C) Telogy specifies in such Termination Notice the representation, warranty, covenant or agreement contained herein of which Potential Purchaser is allegedly in breach, see Section 10.1(f);

(vii)   by either Potential Purchaser or Telogy if (i) Telogy has accepted the bid or bids (including a credit bid) of any Person or Persons other than Potential Purchaser or any of its Affiliates to purchase all or a significant portion of the businesses and assets of Telogy and Telogy has consummated such alternative transaction or (ii) Potential Purchaser is not the Successful Bidder at the Auction, provided that Potential Purchaser shall not be able to terminate pursuant to Section 10(g) of the Stalking Horse Purchase Agreement for fifteen (15) days following an order approving the sale of the Purchased Assets to another buyer, see Section 10.1(g); or

(viii)  b y either party if a Governmental Authority issues a final and non-appealable ruling or Order prohibiting the transactions contemplated by this Agreement, see Section 10.1(h).

(i)   Break-Up Fee and Expense Reimbursement:  In the event that the Stalking Horse Purchase Agreement is terminated by Potential Purchaser or Telogy, as applicable, pursuant to Sections 10.1(b)(ii), 10.1(b)(iii), 10.1(b)(iv), 10.1(b)(v), 10.1(b)(vi) or 10.1(g), then Telogy shall pay the Break-Up Fee plus the Expense Reimbursement in cash to Potential Purchaser; and (ii) in the event that the Stalking Horse Purchase Agreement is terminated by Potential Purchaser pursuant to Section 10.1(c), then Telogy shall pay only the Expense Reimbursement in cash to Potential Purchaser if, and only if, the failure of the Closing Date to occur within ninety (90) days of the Effective Date is the result of any breach by Telogy of any provision contained in this Agreement.  All payments made pursuant to Section 10.2(b) shall be paid as promptly as possible but in any event within three Business Days following termination.

(j)   Access to Records After Closing:

(i)   Pursuant to Section 12.5(a) of the Stalking Horse Purchase Agreement, for a period of three (3) years after the Closing Date, Telogy and its Representatives shall have reasonable access to all of the books and records of the Business transferred to Potential Purchaser under the Stalking Horse Purchase Agreement to the extent reasonably necessary for Telogy to complete the Filings, the wind-down of its estate, and as may be reasonably required in connection with resolution of any Excluded Liability.  Such reasonable access shall be afforded by Potential Purchaser

upon receipt of reasonable advance notice and during normal business hours. Telogy shall be solely responsible for any costs or expenses incurred by it pursuant to the preceding sentences of this paragraph. If Potential Purchaser shall desire to dispose of any of such books and records prior to the expiration of such three-year period, Potential Purchaser shall, prior to such disposition, give Telogy a reasonable opportunity, at Telogy's expense, to segregate and remove such books and records as Telogy may select.

(ii) Pursuant to <u>Section 12.5(b)</u> of the Stalking Horse Purchase Agreement, for a period of three (3) years after the Closing Date, Potential Purchaser and its Representatives shall have reasonable access to all of the books and records relating to the Business that Telogy may retain after the Closing Date. Such access shall be afforded by Telogy upon receipt of reasonable advance notice and during normal business hours. Potential Purchaser shall be solely responsible for any costs and expenses incurred by it pursuant to this paragraph. If Telogy shall desire to dispose of any of such books and records prior to the expiration of such three-year period, Telogy shall, prior to such disposition, give Potential Purchaser a reasonable opportunity, at Potential Purchaser's expense, to segregate and remove such books and records as Potential Purchaser may select.

(iii) Notwithstanding anything to the contrary contained in the Stalking Horse Purchase Agreement, Telogy or Potential Purchaser shall be entitled to withhold access to, or examination of, any information which they determine (i) includes Trade Secrets or other proprietary information, (ii) is protected by attorney-client privilege, work-product privilege, or any other similar privilege or doctrine, (iii) the disclosure of which is prohibited pursuant to applicable Law, <u>see</u> <u>Section 12.5(c)</u>.

(k) <u>Subject to Court Approval</u>: The Stalking Horse Purchase Agreement is subject to Court approval, <u>see</u> <u>Section 7.5</u>.

13. The Stalking Horse Purchase Agreement contemplates the simultaneous execution of the Transition Services Agreement, whereby Telogy shall provide certain post-petition transitional services and licenses to Potential Purchaser with respect to the Business following the Closing Date for a limited period of time to facilitate the transfer of the Purchased Assets. As consideration for such Services, Potential Purchaser shall pay Telogy the amounts set forth on the Service and License Schedule, which will ensure that the Debtor is reimbursed for the costs to the estate of providing such services and licenses.

DB02:9183934.1

069120.1001

## BIDDING PROCEDURES AND RELEVANT NOTICES

A.    Proposed Bidding Procedures

14.    Telogy believes the proposed Bidding Procedures, which are annexed as Schedule 1 to the Bidding Procedures Order, will maximize the realizable value of the Purchased Assets for the benefit of Telogy's estate, creditors and other interested parties.  The Bidding Procedures contemplate an auction process pursuant to which bids for the Purchased Assets will be subject to higher or otherwise better offers.  While the Bidding Procedures afford the Potential Purchaser some measure of protection for its "stalking horse" bid by virtue of the Break-Up Fee and Expense Reimbursement, they primarily benefit Telogy by creating a bidding process that ensures, among other things:  (i) structure and logistical certainty to the process; (ii) Telogy's ability to compare the relative values of competing offers, if any; (iii) that a potential Alternative Potential Purchaser has the financial wherewithal to timely consummate its purchase; and (iv) meaningful bidding increments.  Telogy seeks to implement a competitive bidding process designed to maximize recovery for the benefit of its estate.  As described below and more fully in the Bidding Procedures, only Qualified Bidders who timely submit Qualified Bids will be eligible to participate in the Auction.  Specifically, the Bidding Procedures provide, in relevant part, as follows:[6]

    (a)    Participation Requirements.  In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in the Purchased Assets (a "**Potential Bidder**") must first deliver the following materials to Telogy, the Agent and each of their counsel:

---

[6]    The following description of the Bidding Procedures is a summary of the terms set forth in the Bidding Procedures annexed to the Bidding Procedures Order as Schedule 1.  Capitalized terms used but not defined in this section have the meanings ascribed to them in the Bidding Procedures.  To the extent that this summary differs in any way from the terms set forth in the Bidding Procedures, the terms of the Bidding Procedures shall control.

                  

(i)     an executed confidentiality agreement in form and substance satisfactory to Telogy and its counsel which, in the aggregate, is no less favorable to Telogy than the confidentiality agreement executed by McGrath in connection with the McGrath's and Telogy's negotiations relating to the Stalking Horse Purchase Agreement;

(ii)     the most current audited and latest unaudited financial statements (collectively, the "**Financials**") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of a Sale transaction, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to Telogy that demonstrates the Potential Bidder's financial ability to consummate a competing sale transaction, and (y) a written commitment acceptable to Telogy of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with a sale transaction (including being bound by the terms and conditions of the Bidding Procedures); provided, that, if a Potential Bidder is unable to provide Financials, Telogy may accept such other information sufficient to demonstrate to Telogy's reasonable satisfaction that such Potential Bidder has the financial wherewithal to consummate a sale transaction. The Potential Bidder also must establish that it has the financial ability to consummate its proposed transaction within the timeframe contemplated for consummation of the Stalking Horse Purchase Agreement. A person meeting the requirements set forth in this paragraph shall be considered a "**Qualified Bidder**."

(b)     Qualified Bid. Telogy, after consultation with the Agent, shall determine whether a bid qualifies as a "**Qualified Bid**." To constitute a Qualified Bid, a bid (other than the Stalking Horse Purchase Agreement, which shall constitute a Qualified Bid) must be a written irrevocable offer from a Qualified Bidder and:

(i)     state that the Qualified Bidder offers to consummate the Sale pursuant to a legally binding agreement that is substantially similar to the Stalking Horse Purchase Agreement and has marked the Stalking Horse Purchase Agreement to show amendments and modifications thereto, including price, assets to be purchased and terms, that are being proposed by the Qualified Bidder, as applicable, (the "**Marked Purchase Agreement**"). IF ANY BID IS CONDITIONED ON THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND/OR UNEXPIRED LEASES, THEN SUCH POTENTIAL BIDDER SHALL BE REQUIRED TO PROVIDE EVIDENCE OF ITS ABILITY TO PROVIDE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE OF SUCH CONTRACTS OR LEASES ALONG WITH THE BID;

(ii)     equal or exceed the consideration being paid by the Potential Purchaser pursuant to the Stalking Horse Purchase Agreement plus $767,240, which is the sum of (a) $500,430 (the amount of the Break-Up Fee), (b) $166,810

DB02:9183934.1     069120.1001

(the maximum amount of the Expense Reimbursement), and (c) $100,000, the minimum initial bidding increment;

(iii)    contain a list of Telogy's executory contracts and unexpired leases with respect to which the bidder seeks assignment from Telogy (which may include some or all of the contracts and leases included in the Stalking Horse Purchase Agreement and some or all of the excluded contracts not included in the Stalking Horse Purchase Agreement);

(iv)    confirm that the offer shall remain open and irrevocable as provided below;

(v)    enclose a copy of the proposed clean and Marked Purchase Agreement;

(vi)    provide written evidence that the Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its bid and the execution of the Marked Purchase Agreement, or a representation that no such authorization or approval is required;

(vii)    be accompanied with a certified or bank check or wire transfer in an amount equal to $844,050 as a minimum good faith deposit (the "**Minimum Deposit**"), which Minimum Deposit shall be used to fund a portion of the purchase price provided for in the bid;

(viii)    be on terms that ar e not materially more burdensome or conditional than the terms of the Stalking Horse Purchase Agreement;

(ix)    not be conditioned on obtaining financing or the outcome of any due diligence by the Qualified Bidder;

(x)    by its terms remain open and irrevocable until the earlier of: (a) closing of the Sale to a Successful Bidder or the Back-up Bidder (each as defined below), as applicable; and (b) such date as Telogy affirms in writing that it does not intend to pursue a Sale transaction;

(xi)    contain evidence satisfactory to Telogy, after consultation with the Agent, that a Qualified Bidder is reasonably likely to obtain prompt regulatory approval, if any is required, to purchase the Purchased Assets;

(xii)    not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment; and

(xiii)    full y disclose the identity of each entity participating in connection with such bid, and the complete terms of any such participation.

(c)    <u>Bid Deadline and Submission</u>. Bids must be received no later than the deadline established by the Bidding Procedures Order for the submission of bids (the "**Bid**

**Deadline**") by: (i) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn: Matthew B. Lunn, Esq. and Donald J. Bowman, Jr., Esq.), co-counsel to Telogy; (ii) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: John C. Longmire, Esq. and Shaunna D. Jones, Esq.), co-counsel to Telogy; (iii) Telogy, LLC, 3200 Whipple Road, Union City, California 94587 (Attn: Gary B. Phillips); and (iv) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801 (Attn: Richard Schepacarter, Esq.). After the Bid Deadline, each Qualified Bidder that submits a Qualified Bid will be provided with copies of any other Qualified Bid(s). The Agent shall be provided copies of all bids received by the Debtor.

(d)  Auction. If a Qualified Bid by a Qualified Bidder is received by the Bid Deadline (other than the Stalking Horse Purchase Agreement), the Auction with respect to the Purchased Assets shall take place on the date established by the Bidding Procedures Order at the offices of Willkie Farr & Gallagher, LLP, 787 Seventh Avenue, New York, New York 10019, or such other place and time as Telogy shall notify all Qualified Bidders (including the Potential Purchaser) and other invitees. If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held.

(e)  Auction Rules.

(i)  Only a Qualified Bidder (including the Potential Purchaser) and its authorized representatives who have submitted a Qualified Bid will be eligible to participate at the Auction. At the Auction, only the Potential Purchaser and Qualified Bidders who have submitted a Qualified Bid will be permitted to increase their bids. The bidding at the Auction shall start at the purchase price stated in the highest or otherwise best Qualified Bid as disclosed to all Qualified Bidders prior to commencement of the Auction (the "**Starting Qualified Bid**"), and then continue in minimum increments of $25,000.

(ii)  Unless otherwise agreed by Telogy, in its sole discretion and with respect of and in the best interests of the estate only, no Qualified Bidder will be permitted more than one-half hour to respond to the previous bid at the Auction and, at the expiration of such time (if no new Qualified Bid is received), the Auction shall conclude.

(iii)  During the course of the Auction, Telogy shall inform each participant which Qualified Bid reflects, in Telogy's view (after consultation with the Agent), the highest or otherwise best offer. To the extent that such bid has been determined to be the highest or otherwise best offer entirely or in part because of the addition, deletion or modification of a provision or provisions in the Stalking Horse Purchase Agreement, or related ancillary agreement or, if applicable, in the Qualified Bid, other than an increase in the cash purchase price, Telogy shall provide notice to each participant of

the value ascribed by Telogy to any such added, deleted or modified provision or provisions.

(iv) <u>Adjournment of Auction</u>. The Auction may be adjourned as Telogy, in consultation with the Agent, deems appropriate. Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to Qualified Bidders that have submitted a Qualified Bid and other invitees.

(v) <u>Subsequent Bids by Potential Purchaser</u>. The <u>Potential Purchaser</u> shall have the right to include the Break-Up Fee and the maximum amount of the Expense Reimbursement in the amount of any subsequent bid that it makes in the Auction and, in the event the <u>Potential Purchaser</u> is the Successful Bidder as a result of a subsequent bid made at the Auction, the <u>Potential Purchaser</u> shall be entitled to credit sum of the Break-Up Fee and the maximum amount of the Expense Reimbursement against the Purchase Price payable at Closing.

(vi) Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(vii) Bidding at the Auction will be transcribed or videotaped.

(f) <u>Other Terms</u>. All Qualified Bids, the Auction, and the Bidding Procedures are subject to such additional terms and conditions as are announced by Telogy not inconsistent with the Bidding Procedures Order. At the conclusion of the Auction, in consultation with and upon approval of the Agent, Telogy shall identify the bid made pursuant to the Bidding Procedures that represents, in Telogy's sole discretion, the highest or otherwise best offer (the "**Successful Bid**," and the Qualified Bidder who submitted the Successful Bid, the "**Successful Bidder**") and the next highest or otherwise best offer after the Successful Bid (the "**Back-up Bid**," and the Qualified Bidder who submitted the Back-up Bid, the "**Back-up Bidder**"). If an Auction is held, Telogy shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Auction; (ii) definitive documentation has been executed in respect thereof; and (iii) the Court has entered an order approving such Successful Bid.

(g) Following the entry of the Sale order, if the Successful Bidder fails to consummated the Sale because of a breach or failure to perform on the part of the Successful Bidder, the Back-up Bidder will be deemed to have the new Successful Bid, and Telogy will be authorized, but not required, to consummate the Sale with the Back-up Bidder without further order of the Court. In such case, the defaulting Successful Bidder's Minimum Deposit shall be forfeited to Telogy and Telogy shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder. If Potential Purchaser is chosen as the

DB02:9183934.1

069120.1001

Back-up Bidder, Potential Purchaser shall be under no obligation to hold the Back-up Bid open, and not revoke such Bid, past the earlier of (i) the date of termination of the Stalking Horse Purchase Agreement in accordance with its terms, and (ii) the date that is fifteen (15) days after the entry of the Auction.

(h)     Telogy will present the results of the Auction to the Bankruptcy Court at the Sale Hearing (as defined below), at which time certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that: (i) the Auction was conducted and the Successful Bidder was selected in accordance with these Bidding Procedures; (ii) the Auction was fair in substance and procedure; and (iii) consummation of the Sale contemplated by the Successful Bid will provide the highest or otherwise best value for the Purchased Assets and is in the best interests of Telogy and its creditors.

(i)     <u>Sale Hearing</u>.  A hearing to consider approval of the Sale of the Purchased Assets to the Successful Bidder (or to approve the Stalking Horse Purchase Agreement if no Auction is held) will take place on the date established by the Bidding Procedures Order in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Wilmington, Delaware 19801 (the "**<u>Sale Hearing</u>**").

(j)     <u>Return of Deposit</u>.  Except as otherwise provided in this paragraph with respect to any Successful Bid, the Minimum Deposits of all Qualified Bidders that submitted such a deposit under the Bidding Procedures shall be returned upon or within three (3) business days after the earlier of:  (a) closing of the Sale to the Successful Bidder or the Back-up Bidder; and (b) such date as Telogy affirms in writing that it does not intend to pursue a Sale transaction.  The Minimum Deposit of the Successful Bidder shall be held until the closing of the Sale of the Purchased Assets and applied in accordance with the Successful Bid.

(k)     <u>Failure to Close</u>.  If the Successful Bidder fails to consummate the transaction in accordance with the terms of the purchase agreement executed by the Successful Bidder by the closing date contemplated in the purchase agreement agreed to by the parties for any reason, Telogy shall (except in the case of the Potential Purchaser, in which case the provisions with respect to the Break-Up Fee and Expense Reimbursement in the Stalking Horse Purchase Agreement shall apply to the extent applicable): (i) retain the Successful Bidder's Deposit (except in the case of Potential Purchaser, whose rights to any deposit shall be governed by the Stalking Horse Purchase Agreement); (ii) maintain the right to pursue all available remedies, whether legal or equitable available to it; and (iii) be free to consummate the proposed transaction with the Back-up Bidder at the highest price bid by the Back-up Bidder at the Auction, without the need for an additional hearing or Order of the Court.

(l)     <u>Reservation of Rights</u>.  Except as otherwise provided in the Stalking Horse Purchase Agreement or the Bidding Procedures Order, Telogy in consultation with the Agent reserves the right as it may reasonably determine to be in the best

interests of its estate, to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of Telogy and its estate; (v) remove some of the Purchased Assets from the Auction, (vi) waive terms and conditions set forth herein with respect to all Potential Bidders; (vii) impose additional terms and conditions with respect to all Potential Bidders; (viii) extend the deadlines set forth herein; (ix) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (x) modify the Bidding Procedures as it may determine to be in the best interests of its estate or to withdraw the Motion at any time with or without prejudice.

(m) <u>Expenses.</u> Any bidders presenting bids shall bear their own expenses in connection with the proposed sale, whether or not such sale is ultimately approved, in accordance with the terms of the purchase agreement. Notwithstanding the foregoing, the Potential Purchaser may recover expenses in accordance with the provisions of the Stalking Horse Purchase Agreement.

15. Telogy believes that the Bidding Procedures are fair and reasonable, and are not likely to dissuade any serious potential alternative purchaser from bidding in a manner permitted under paragraph 14 above.

B. <u>Notice of Auction and Sale Hearing</u>

16. Telogy further requests that the objection deadline with respect to the Sale of the Purchased Assets be at least seven (7) business days prior to the Sale Hearing.

17. On or before three (3) business days after entry of the Bidding Procedures Order, Telogy will cause the notice attached as <u>Schedule 2</u> to the Bidding Procedures Order (the "**Notice of Auction and Sale Hearing**") and the Bidding Procedures Order to be sent by first-class mail postage prepaid, to the following: (i) the Office of the United States Trustee; (ii) counsel for any statutory committee in these cases, if and when appointed; (iii) counsel to the agent for Telogy's prepetition secured lenders; (iv) all taxing authorities and other governmental agencies having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service; (v) all parties that have requested or that are required to receive special notice pursuant to

DB02:9183934.1                                                                      069120.1001

Bankruptcy Rule 2002; (vi) all Persons known or reasonably believed to have asserted an Interest in any of the Purchased Assets; (vii) the non-Debtor parties to the Executory Contracts and Unexpired Leases; (viii) all Persons known or reasonably believed to have expressed an interest in acquiring all or substantially all of the Purchased Assets within the last six months; (ix) the Attorneys General in the State(s) where the Purchased Assets are located; (x) the United States Environmental Protection Agency; and (xi) any applicable state environmental agency.[7] In addition to the foregoing, (i) electronic notification of this Motion, the Bidding Procedures Order and the Notice of Auction and Sale Hearing also will be posted on the Court's website, www.deb.uscourts.gov; and (ii) on or before three (3) business days after entry of the Bidding Procedures Order, Telogy will: (a) serve the Notice of Auction and Sale Hearing on all known creditors of Telogy; and (b) subject to applicable submission deadlines, publish the Notice of Auction and Sale Hearing once in one or more publications Telogy deems appropriate, including but not limited to the San Francisco Chronicle (national edition).

18. In addition, to facilitate the Sale of the Purchased Assets and the assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases, Telogy shall serve a notice of potential assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases (the "**Notice of Assumption and Assignment**"), attached as Schedule 3 to the Bidding Procedures Order, on all non-debtor parties to the Executory Contracts and Unexpired Leases, on or before three (3) business days after the entry of the Bidding Procedures Order by first class mail or hand delivery. If Telogy identifies additional executory

---

[7]    The Notice of Auction and Sale Hearing will direct parties to contact Willkie Farr & Gallagher LLP, proposed co-counsel to Telogy, or Broadpoint Capital, Inc., investment banker for Telogy, for more information and will provide that any party in interest that wishes to obtain a copy of any related document (including the Stalking Horse Purchase Agreement), subject to any necessary confidentiality agreement, may make a request in writing as specified in the Notice of Auction and Sale Hearing.

069120.1001

contracts or unexpired leases that might be assumed by Telogy and assigned to Potential Purchaser not set forth in the original Notice of Assumption and Assignment, Telogy will promptly send a supplemental notice (a "**Supplemental Notice of Assumption and Assignment**") to the applicable counterparties to such additional executory contracts and unexpired leases.

19.     In the Notice of Assumption and Assignment, Telogy will identify whether the Executory Contract and Unexpired Lease is a Purchased Asset and the calculation of the undisputed cure amounts that Telogy believes must be paid to cure all defaults under the Executory Contracts and Unexpired Leases, as of the date of such notice (the "**Cure Amounts**"). If no amount is listed on the Notice of Assumption and Assignment to be served, Telogy believes that there is no Cure Amount, as of the date of such notice (the "**Cure Date**"). Telogy requests that unless the non-debtor party to an Executory Contract or Unexpired Lease files an objection (the "**Cure Amount/Assignment Objection**") to (a) its scheduled Cure Amount and/or (b) to the proposed assumption, assignment and/or transfer of such Executory Contract or Unexpired Lease by the later of (i) 4:00 p.m. (prevailing Eastern time) on the date that is three (3) business days prior to the Bid Deadline or (ii) ten (10) days after service of the Supplemental Notice of Assumption and Assignment (such later date, the "**Cure/Assignment Objection Deadline**") and serves a copy of the Cure Amount/Assignment Objection so as to be received no later than the Cure/Assignment Objection Deadline on the same day to: (a) Telogy, 3200 Whipple Road, Union City, CA 94587 (Attn: Gary B. Phillips, Esq.); (b) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn: Robert S. Brady, Esq. and Matthew B. Lunn, Esq.), co-counsel to Telogy; (c) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: John C. Longmire,

Esq. and Shaunna D. Jones, Esq.), co-counsel to Telogy; (d) counsel to any statutory committee that may be appointed in these cases; and (e) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801 (Attn: Richard Schepacarter, Esq.); then such non-debtor party will (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract and Unexpired Lease and Telogy shall be entitled to rely solely upon the Cure Amount, and (ii) if the Executory Contract or Unexpired Lease was identified as a Purchased Asset and the Potential Purchaser is the Successful Bidder, be deemed to have consented to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease as of the Cure Date, and shall be forever barred and estopped from asserting or claiming against Telogy, the Potential Purchaser or such other Successful Bidder or any other assignee of the relevant Executory Contract or Unexpired Lease that any additional amounts are due or defaults exist, or conditions to assumption, assignment and/or transfer must be satisfied, under such Executory Contract or Unexpired Lease as of the Cure Date. All amounts due and owing under the Executory Contracts and Unexpired Leases after the Cure Date that are to be assumed and assigned shall be satisfied in the ordinary course.

20. Telogy also requests that if an objection challenges a Cure Amount, such objection must set forth the cure amount being claimed by the objecting party (the "**Claimed Cure Amount**") with appropriate documentation in support thereof. Upon receipt of an objection to a Cure Amount, Telogy may, in its sole discretion, hold an amount equal to the Claimed Cure Amount in reserve pending further order of the Court or agreement between Telogy and the objecting party. So long as Telogy holds the Claimed Cure Amount in reserve,

DB02:9183934.1

069120.1001

Telogy may seek authority to assume, assign and/or transfer the Executory Contract or Unexpired Lease that is the subject of an objection without further delay.

21.     Telogy, the Potential Purchaser or the other Successful Bidder, as the case may be, may determine to exclude any Executory Contract or Unexpired Lease (an "**Excluded Contract**") from the list of Purchased Assets no later than the fifth (5th) business day prior to the Sale Hearing.  The non-debtor party or parties to any such Excluded Contract will be notified of such exclusion by written notice mailed within two (2) business days of such determination.

22.     In the event that the Potential Purchaser is not the Successful Bidder for the Purchased Assets and for those Executory Contracts and Unexpired Leases identified in the Notice of Assumption and Assignment, within two (2) business days after the conclusion of the Auction for the Purchased Assets, Telogy will serve a notice identifying the Successful Bidder to the non-Debtor parties to the Executory Contracts and Unexpired Leases that have been identified in such Successful Bid.  Telogy proposes that the non-Debtor parties to the Executory Contracts and Unexpired Leases have until 11:00 a.m. (prevailing Eastern Time) on the date that is two (2) business days prior to the Sale Hearing (the "**Adequate Assurance Objection Deadline**") to object to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

## AUTHORITY FOR REQUESTED RELIEF

A.     The Sale of the Purchased Assets is Within the Sound
       Business Judgment of Telogy and Should be Approved

23.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 363 of the

24

Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

24.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith. Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, as set forth more fully herein, Telogy submits that the decision to proceed with a Sale of the Purchased Assets and the Bidding Procedures is based upon sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.

DB02:9183934.1                                                    069120.1001

<u>Lionel</u>, 722 F.2d at 1071; <u>Montgomery Ward</u>, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

25.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  <u>In re Fesco Plastics Corp.</u>, 996 F.2d 152, 154 (7th Cir. 1993); <u>Pincus v. Graduate Loan Ctr. (In re Pincus)</u>, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. <u>See</u>, <u>e.g.</u>, <u>Chinichian v. Campolongo (In re Chinichian)</u>, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); <u>In re Cooper Props. Liquidating Trust, Inc.</u>, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

26.     Telogy submits that more than ample business justification exists to sell the Purchased Assets to the Potential Purchaser (or other Successful Bidder) pursuant to the Bidding Procedures, thereby satisfying the first prong of <u>Abbotts Dairies</u>.  The prompt Sale of the Purchased Assets presents the best opportunity to maximize the value for the estates in light

DB02:9183934.1                                        069120.1001

of the need to manage and transition the Purchased Assets to a Potential Purchaser. In addition, Telogy believes that the Bidding Procedures are the best method by which they can obtain the most value for the Purchased Assets and provide interested parties with accurate and reasonable notice of the Sale. The Bidding Procedures will allow Telogy to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that Telogy will receive the best possible consideration for the Purchased Assets by helping ensure a competitive and fair bidding process.

27. Telogy believes the sale of its operations and assets must occur quickly in order to maximize the value of its estate, and that significant time spent in chapter 11 increases the real and palpable risk of business loss and value deterioration. Absent a prompt Sale pursuant to the procedures and timelines proposed, Telogy believes that the going concern value of the Purchased Assets will be significantly compromised. Telogy believes that its business is not of the type that can survive a prolonged stay in chapter 11. The success of Telogy's business relies in great part on its reputation as a reliable provider of general purpose test equipment. Many of Telogy's customers are middle-market or small companies that may not be accustomed to dealing with vendors operating in chapter 11. Each day that Telogy remains in chapter 11, customers may lose faith in Telogy's ability to continue to provide the equipment on which its business relies. As a result, such customers will look to alternative suppliers of general purpose test equipment to prevent disruption to their supply chain, and Telogy will lose valuable market share and revenue. Such erosion of Telogy's customer base will make the Purchased Assets far less attractive to potential purchasers. Therefore, it is imperative that Telogy effect a Sale as early on in this case as possible. Telogy further believes that a targeted sale process is most

likely to achieve the highest and best price for the Purchased Assets and will do so in an efficient and timely manner, enabling Telogy's business to emerge successfully from this case. Telogy respectfully submits that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of its estate for the benefit of Telogy and its stakeholders.

28.     In addition, the notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Purchased Assets in the past six months. Accordingly, the proposed sale of the Purchased Assets satisfies the second prong of the Abbotts Dairies standard.

29.     The Bidding Procedures are also designed to maximize the value received for the Purchased Assets. The process proposed by Telogy allows for a timely auction process while providing bidders ample time and information to submit a timely bid. Along with Telogy's marketing process, the Bidding Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price. Telogy is subjecting the value of the Purchased Assets to market testing and permitting prospective purchasers to bid on the Purchased Assets, thereby subjecting the proposed Sale to a market check through the solicitation of competing bids in a court-supervised auction process. Accordingly, Telogy and all parties in interest can be assured that the consideration received for the Purchased Assets will be fair and reasonable, and therefore the third prong of the Abbotts Dairies standard is satisfied. As discussed below, the "good faith" prong of the Abbotts Dairies standard is also satisfied here.

DB02:9183934.1                                                            069120.1001

B.     The Proposed Sale is Proposed in "Good Faith"
       Under Section 363(m) of the Bankruptcy Code

       30.     Telogy requests that the Court find that the Potential Purchaser (or other

Successful Bidder) is entitled to the benefits and protections provided by section 363(m) of the

Bankruptcy Code in connection with the sale of the Purchased Assets.

       31.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under
> subsection (b) . . . of this section of a sale . . . of property does not
> affect the validity of a sale . . . under such authorization to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

       32.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of

assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its

interest in the purchased assets if the order allowing the Sale is reversed on appeal.  By its terms,

section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets.

Additionally, the United States Court of Appeals for the Third Circuit (the "**Third Circuit**") has

indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's

interest in executory contracts under Bankruptcy Code section 365.  See Krebs Chrysler-

Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d Cir. 1998).  In Krebs, the Court

considered "whether assignments of [certain automobile dealership] franchises under section 365

are also sales of estate property subject to section 363(m)." Id. at 497.  Despite the absence of an

explicit reference to assignments of executory contracts under section 365 of the Bankruptcy

Code, the Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an

assignment of a debtor's interest in certain automobile franchise agreements pursuant to an

auction sale.  Like the franchise agreements protected in Krebs, the Executory Contracts and

Unexpired Leases are contracts that may be assumed, assigned and/or transferred pursuant to section 365 of the Bankruptcy Code. In light of <u>Krebs</u>, Telogy respectfully submits that section 363(m) applies to protect the Potential Purchaser (or other Successful Bidder) with respect to both the Purchased Assets and the Executory Contracts and Unexpired Leases.

33. As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both Telogy and the potential purchaser to act in good faith in negotiating the Sale of the Purchased Assets and the assignment of the Executory Contracts and Unexpired Leases related thereto. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." <u>Abbotts Dairies</u>, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." <u>Id.</u> (citing <u>In re Rock Indus. Mach. Corp.</u>, 572 F.2d 1195, 1198 (7th Cir. 1978)). <u>See also</u> <u>In re Bedford Springs Hotel, Inc.</u>, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); <u>In re Perona Bros., Inc.</u>, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings." <u>In re Pisces Leasing Corp.</u>, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting <u>Rock Indus. Mach. Corp.</u>, 572 F.2d at 1198).

34. Here, the sale of the Purchased Assets and the assignment and/or transfer of the Executory Contracts and Unexpired Leases, which have been designated by the Potential Purchaser in the Stalking Horse Purchase Agreement and/or will be designated by any

DB02:9183934.1

069120.1001

Successful Bidder,[8] is or will be in good faith. As discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, any sale agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by counsel. No known potential bidder for the Purchased Assets is an insider of Telogy, as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arm's length, good faith basis. Moreover, there is no evidence of fraud or collusion in terms of the proposed Sale. With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. Under the circumstances, the Potential Purchaser or any Alternative Buyer should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

35.     All parties in interest as described in paragraph 17 will receive notice of the Sale proposed herein and will be provided with an opportunity to be heard. Additionally, all counterparties to Executory Contracts and Unexpired Leases will be provided notice of assumption, assignment and/or transfer and an opportunity to be heard. Telogy submits that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

C.     The Proposed Sale Satisfies the Requirements
       of Section 363(f) of the Bankruptcy Code

36.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such

---

[8]     If Telogy ultimately sells the Purchased Assets to an Alternative Buyer in a Superior Transaction, Telogy believes that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code would be appropriate for the Alternative Buyer as well. Pursuant to the Bidding Procedures, any Alternative Buyer will have had to present a proposal superior to that of the Potential Purchaser. Moreover, Telogy will not choose any Alternative Buyer whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and would be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

069120.1001

property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987). With respect to the Interests of the lenders under the Existing Credit Facilities (as defined in the Stalking Horse Purchase Agreement), section 363(f) is satisfied because such lenders have consented to the Sale, which consent is expressly conditioned upon the Closing Date Payment (as defined in the Stalking Horse Purchase Agreement) being paid to the Agent (as defined in the Stalking Horse Purchase Agreement) in accordance with Section 3.2 of the Stalking Horse Purchase Agreement, and such payment not being subject to challenge. With respect to all other Interests, Telogy expects that it will satisfy one or more of the requirements of section 363(f), as will be demonstrated at the Sale Hearing. Accordingly, approval of the Sale of the Purchased Assets free and clear of all Interests is warranted.

DB02:9183934.1 069120.1001

D.     Assumption and Assignment of Executory Contracts
       and Unexpired Leases Should be Approved

37.     To facilitate and effectuate the Sale of the Purchased Assets, Telogy seeks authority to assume, assign and/or transfer various Executory Contracts and Unexpired Leases to the Potential Purchaser (or other Successful Bidder) to the extent required by such purchaser. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), predecessor to Bankruptcy Code Section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

38.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding

                                     

to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

39.     The Potential Purchaser (or other Successful Bidder) will desire to take assignment of certain executory contracts and unexpired leases related to the Purchased Assets. To the extent Executory Contracts and Unexpired Leases are identified for assumption, assignment and/or transfer, Telogy believes that it can and will demonstrate that all requirements for assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases will be satisfied at the Sale Hearing. Telogy, as required by the Bidding Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Purchased Assets. Further, for the reasons stated throughout this Motion, Telogy, in exercising its sound business judgment, believes that selling the Purchased Assets and assuming, assigning and/or transferring to the Potential Purchaser (or other Successful Bidder) the Executory Contracts and Unexpired Leases would be in the best interests of its estate. Moreover, Telogy will provide all parties to the Executory Contracts and Unexpired Leases an opportunity to be heard.

40.     Specifically, Telogy will serve the Notice of Assumption and Assignment on or before three (3) business days after entry of the Bidding Procedures Order on the non-debtor parties to the Executory Contracts and Unexpired Leases. The Notice of Assumption and Assignment will, among other things, identify whether the Executory Contract and Unexpired Lease is a Purchased Asset and respective Cure Amounts, if any. Telogy requests that unless the non-debtor party to an Executory Contract or Unexpired Lease files and serves a Cure Amount/Assignment Objection setting forth the Claimed Cure Amount or objecting to an assumption, assignment and/or transfer to the Potential Purchaser on or before the Cure

DB02:9183934.1                                                                 069120.1001

Objection Deadline, such non-debtor party will (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract and Unexpired Lease as of the Cure Date, and Telogy shall be entitled to rely solely upon the Cure Amount; and (ii) if the Executory Contract and Unexpired Lease was identified as a Purchased Asset and the Potential Purchaser is the Successful Bidder, be deemed to have consented to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease and shall be forever barred and estopped from asserting or claiming against Telogy, the Potential Purchaser or such other Successful Bidder or any other assignee of the relevant Executory Contract and Unexpired Lease that any additional amounts are due or defaults exist, or conditions to assumption, assignment and/or transfer must be satisfied, under such Executory Contract as of the Cure Date. Telogy proposes to satisfy all amounts due and owing under the Executory Contracts and Unexpired Leases after the Cure Date in the ordinary course.

41. In the event that the Potential Purchaser is not the Successful Bidder for the Purchased Assets and for those Executory Contracts and Unexpired Leases that are included in a Successful Bid, within two (2) business days after the conclusion of the auction for the Purchased Assets, Telogy will serve a notice identifying the Successful Bidder to the non-debtor parties to the Executory Contracts and Unexpired Leases that have been identified in such Successful Bid. Telogy requests that objections by a non-debtor party to the Executory Contracts and Unexpired Leases to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code be filed and served on or before the Adequate Assurance Objection Deadline.

DB02:9183934.1 069120.1001

42. Thus, Telogy requests that the assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases should be approved.

E. The Break-Up Fee and the Expense
   Reimbursement are Reasonable and Appropriate

43. Approval of the Break-Up Fee and Expense Reimbursement is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999). In O'Brien, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, [the inquiry] . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." Id. at 535. Here, the Expense Reimbursement should be approved because it will provide a benefit to Telogy's estate.

44. In O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award bidding protections: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors' committees of the break-up fee and expense reimbursement; (8) the benefits of the safeguards to the debtor's estate;

and (9) the "substantial adverse impact [of the break-up fee and expense reimbursement] on unsecured creditors, where such creditors are in opposition to the break-up fee." See id. at 536.

45.     Whether evaluated under the "business judgment rule" applied by certain courts[9] or the Third Circuit's "administrative expense" standard, the Break-Up Fee and Expense Reimbursement should be approved.  First, all negotiations between Telogy and the Potential Purchaser have been conducted in good faith, on an arm's-length basis.  Second, based on Telogy's pre-filing discussions, Telogy has determined that the Break-Up Fee and Expense Reimbursement are necessary to attract and retain a stalking horse bidder.  Specifically, the Potential Purchaser insisted that it receive a break-up fee and expense reimbursement in the event that Telogy determined to sell the Purchased Assets to another bidder.  Telogy's ability to continue to seek a higher or better offer without risk of losing a "bird-in-the-hand" would be eliminated if Telogy could not secure a stalking horse bidder.

46.     Telogy submits that authorization of the Break-Up Fee and Expense Reimbursement will not chill the bidding (if any) for the Purchased Assets.  The Break-Up Fee and Expense Reimbursement were negotiated items and Telogy believes that such incentives are appropriate under the circumstances because:  (a) the Potential Purchaser is providing a substantial benefit to the estates by acting as a "stalking horse" bidder for the Purchased Assets; (b) the Stalking Horse Purchase Agreement will provide a floor by which other bids may be judged; and (c) the Break-Up Fee and Expense Reimbursement afforded to the Potential Purchaser were conditions to the Potential Purchaser's entry into the Stalking Horse Purchase Agreement.  Further, payment of the Break-Up Fee and Expense Reimbursement is not likely to

---

[9]     See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed 3 F.3d 49 (2d Cir. 1993).

069120.1001

diminish Telogy's estate. Telogy will incur the obligation to pay the Break-Up Fee and Expense Reimbursement only if it receives from a third party a higher or better offer on the Purchased Assets, and that offer is subsequently approved by the Court and closes.

47. After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees and expense reimbursements as being appropriate under the facts and circumstances of the case. In re Radnor Holdings, Case No. 06-10894 (Bankr. D. Del. Sep. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); In re Riverstone Networks, Case No. 06-10110 (Bankr. D. Del. Feb. 24, 2006) (approving expense reimbursement up to $1 million where the stalking horse purchase price was $170 million); In re Great Northern Paper, Inc., Case No. 03-10048 (Bankr. D. Me. Feb. 18, 2003) (approving expense reimbursement up to $750,000 in addition to a break-up fee of 5.4%, the aggregate value of which was $5 million); In re FSC Corp., Case No. 00-04659 (Bankr. N.D. Ill. February 28, 2000) (approving expense reimbursement up to $500,000 in addition to a break-up fee of 3.4%, valued at $1,500,000).

F.    Relief from the Ten-Day Waiting Periods
      Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

48. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." Telogy requests that the Bidding Procedures Order and the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

49.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, <u>Collier on Bankruptcy</u> suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, <u>Collier's</u> provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id.</u>

50.     Accordingly, Telogy hereby requests that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

51.     Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware; (b) counsel to the agent for Telogy's prepetition secured lenders; (c) Telogy's twenty (20) largest unsecured creditors on a consolidated basis; (d) counsel to the Potential Purchaser; and (e) all parties known to hold a lien on Telogy's assets. Telogy submits that, under the circumstances, no other or further notice is required.

DB02:9183934.1

069120.1001

## CONCLUSION

WHEREFORE, Telogy respectfully requests: (a) entry of the proposed Bidding Procedures Order, substantially in the form attached hereto as Exhibit B; (b) entry of the proposed Sale Order, substantially in the form attached hereto as Exhibit C; and (c) such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware  
        January 24, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Matthew B. Lunn (No. 4119)  
Donald J. Bowman, Jr. (No. 4383)  
Robert F. Poppiti, Jr. (No. 5052)  
The Brandywine Building  
1000 West Street, 17th Floor  
Wilmington, Delaware 19801  
Telephone: (302) 571-6600  
Facsimile: (302) 571-1253

-and-

WILLKIE FARR & GALLAGHER LLP  
John C. Longmire  
Shaunna D. Jones  
Andrew D. Sorkin  
787 Seventh Avenue  
New York, New York 10019-6099  
Telephone: (212) 728-8000  
Facsimile: (212) 728-8111

*Proposed Co-Counsel to the Debtors*  
*and Debtors in Possession*

DB02:9183934.1

069120.1001